643 P.2d 835

**The STATE of Idaho, Plaintiff-Respondent,**

v.

**Fred E. RUYBAL, Defendant-Appellant.**

**No. 13491.**

Court of Appeals of Idaho.

March 23, 1982.

Gary D. DeMeyer of DeMeyer & DeMeyer, Middleton, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A. I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

Fred Ruybal was found guilty by jury verdict of the offense of delivery of amphetamines, a controlled substance. He appeals, asserting that several errors occurred during his trial which require reversal of the conviction. We *affirm.*

This appeal raises the following issues: Did the trial court err by not inquiring whether Ruybal was provided a list of prospective jurors sufficiently in advance of trial to dispute the composition of the jury panel under the Uniform Jury Selection and Service Act? Did prejudice result from removal of Ruybal's shirt in the courtroom, to display his tattoos, which denied him a fair trial? Was there sufficient foundation for the chain of custody of the amphetamines, between the Idaho Bureau of Investigations and the Idaho State Forensic Laboratory, to allow the amphetamines to be admitted in evidence?

The following relevant facts appear from the trial record.

On November 3, 1978, Douglas J. Williams, an undercover agent for the Idaho State Police Department, Bureau of Investigation, along with three other investigators and a confidential informant, went to a residence in Nampa, Idaho. Williams had a "body bug" on his person and $500.00 in marked currency.

The three investigators positioned themselves outside the residence for surveillance, while Williams and the confidential informant entered the residence. They were met at the door and invited into the front room where, they waited until another individual, identified by the confidential informant as "Fred", came from the kitchen. Williams observed the individual was wearing a white sleeveless T-shirt and had tattoos on each forearm and a tattoo on his upper left arm.

After having a friendly conversation with Fred, Williams went into the kitchen where he purchased four bags of white "cross-top"

pills at $125.00 per bag from Fred. The confidential informant did not witness the transaction, but the conversations were picked up on Williams' "body bug". Williams put the four bags of pills in his pocket. He left the residence and proceeded to a parking lot where he met the other three investigators. Ruybal was subsequently arrested for the offense of delivery of a controlled substance.

Immediately after Williams had received the amphetamines from Ruybal, he drove to his office in Boise. There he weighed the items, put an initialed sticker inside one of the four bags, and placed them inside a sealed evidence envelope on which he had written the number assigned to the case. He then locked the sealed envelope in a fireproof file cabinet. He had the only key to the cabinet.

Five days later, he retrieved the evidence from the cabinet and transported it to the State Forensic Laboratory, turning the envelope over to the evidence technician. Approximately two months later he picked up the evidence from the state laboratory and transported it for use at the preliminary hearing. At the preliminary hearing, the presiding magistrate remanded the evidence back to Williams' custody.

Williams then stored the evidence in his locked cabinet until shortly before trial, when he returned the evidence to the state laboratory for more tests. Two days later, he picked up the envelope from the laboratory and delivered it to court for use in Ruybal's trial. The evidence envelope and its contents were marked and admitted into evidence.

At trial, Mrs. Southcombe, a forensic chemist, testified that the evidence envelope came into the possession of the state laboratory on November 8th, 1978. She tested the evidence on November 9th, initialed and sealed the evidence envelope and returned it to the evidence technician. She received the envelope again on June 26th, 1979, with her previous seal unbroken. She again analyzed the evidence, resealed the envelope and returned it to the evidence technician. She determined from the tests that the pills in the envelope were amphetamines.

Ruybal's first contention on appeal relates to the composition of the jury selected to try the case. The record shows that during a recess in the process of examining persons to serve as jurors, counsel for Ruybal objected to the make-up of the jury panel on the basis of age and apparent ethnic origin. The court overruled the objection, noting the jury selection process was in accordance with the law. *See State v. Pontier*, 95 Idaho 707, 518 P.2d 969 (1974) (age of jurors, compared with defendant's age) and *State v. Gerhardt*, 97 Idaho 603, 549 P.2d 262 (1976) (race and ethnic origins compared).

Ruybal now argues the court should have inquired and determined whether he was provided with information concerning the prospective jurors sufficiently in advance to allow him to discover "adequate grounds of substantial failure to comply" with the Uniform Jury Selection and Service Act (Idaho Code, Title 2, Chapter 2). We find no such duty incumbent on the trial court. A party who contends purposeful discrimination occurred in the selection of a jury panel bears the burden of proving that contention. *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). He is required to make a timely challenge to the jury panel under the statutes. *Carr v. State*, 514 P.2d 413 (Okl.Cr.1973). I.C. §§ 2–213(1) and (2) prescribe the exclusive procedure to challenge a jury panel on the ground that the venire was not selected in conformity with the Uniform Act. I.C. § 2–213(3). Those statutes allow a party to move for appropriate relief where substantial failure to comply with the Act in selecting the jury panel has been discovered. The Act requires that a motion be made within seven days after discovery of grounds therefor; however, the motion cannot be made after the jury is sworn to try the cause. I.C. § 2–213(1). *See also* I.C. § 19–2006; *State v. Wozniak*, 94 Idaho 312, 486 P.2d 1025 (1971). The statute contemplates that a party should use reasonable diligence in asserting his rights. Part of

the relief allowed by the statute is to stay further proceedings in the matter. The record shows absence of any effort on the part of Ruybal to accomplish any of these things. We hold that it is untimely for Ruybal now to question the jury selection process. *See People v. Jones,* 9 Cal.3d 546, 108 Cal.Rptr. 345, 352, n.7, 510 P.2d 705, 712, n.7 (Cal. 1973).

▮ Ruybal next contends he was denied a fair trial because of prejudice, humiliation and degradation caused by removal of his shirt in the courtroom to display his tattoos. He argues it was not necessary to disrobe his upper torso; that photographs could have been made of his body and submitted to the jury. He further argues that the display was not necessary, because he had already been physically identified in court by the eyewitness Williams.

The record does not support Ruybal's contention. Ruybal raised the defense of alibi, i.e., that he was not the person who delivered the amphetamines to Williams. Williams identified Ruybal in the courtroom. Williams testified to the characteristics he observed about the person who delivered the substances to him. He described tattoo markings on both the forearms and on the upper left arm, near the shoulder, of the deliveror. The prosecutor then asked the court to direct Ruybal to display his forearms and upper left arm to the jury. Defense counsel objected on the basis of lack of probative value. The court ruled that the request called for admissible evidence. The court then "asked" Ruybal to roll up his shirt sleeves, whereupon Ruybal removed his shirt and exposed his entire torso to the jury.

We hold that the uniqueness of the type and location of the tattoos on Ruybal's arms were probative of the issue of identification. The probative value of the evidence outweighed any prejudicial effect created by the display made by Ruybal. *State v. Bowden,* 113 R.I. 649, 324 A.2d 631 (1974), *cert. den.,* 419 U.S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975). A trial court has broad discretion in the admission of evidence at trial. Absent an abuse of that discretion,

its judgment will not be reversed. *State v. Terry,* 98 Idaho 285, 561 P.2d 1318 (1977); *State v. Bowden, supra.* We find no abuse of discretion on the part of the trial court in this regard. Its ruling will not be overturned.

Ruybal's final argument of error relates to the admission in evidence of the amphetamines. At trial, Williams testified that he delivered the sealed envelope to the evidence technician at the state laboratory. Mrs. Southcombe testified that she received the sealed envelope from the evidence technician. Mrs. Southcombe opened the envelope and chemically tested and analyzed the contents. She then replaced the contents into the envelope, sealed it, and returned it to the evidence technician. Williams testified that he received the sealed envelope from the evidence technician at the state laboratory, for use in court.

Mrs. Southcombe also testified concerning the ordinary procedure for handling evidence received and tested by the laboratory. She stated:

> We have a—a general receiving area for the officers to bring their evidence in, and we have an evidence technician that logs in the evidence, gives the officer a receipt, and then she places the evidence in a vault in a locked room, and when it is time for the analysis to be performed, the chemist goes and checks it out from the evidence technician and takes it back to the laboratory.
>
> When the analysis is complete, then we return it back to the evidence technician. She processes the paper work, and notifies the officer that the casework is finished. Then it is returned at some time later to the officer.

Mrs. Southcombe testified that in respect to the envelope containing the amphetamines, it was sealed both times when received by her, and was resealed by her both times when it was returned to the evidence technician. She testified that there was no indication that any of the seals had ever been broken except as necessary for her to conduct tests on the contents.

At trial defense counsel objected to the admission of the exhibit in evidence. He argued that because the evidence technician did not appear and testify regarding custody of the envelope between the times it was possessed by Williams and Southcombe, there was a break in the chain of custody of the evidence. The court overruled the objection and admitted the exhibit in evidence.

In support of his position, Ruybal cites the Idaho cases of *State v. McFarland*, 88 Idaho 527, 401 P.2d 824 (1965); *State v. Coburn*, 82 Idaho 437, 354 P.2d 751 (1960); *State v. Webb*, 76 Idaho 162, 279 P.2d 634 (1955) and *State v. Healey*, 45 Idaho 73, 260 P. 694 (1927). The State also cites *McFarland, Coburn* and *Webb* for the proposition that the evidence in this case was admissible.

Reviewing these cases, we find that *Healey* is inapposite to the facts of this case, and agree with the State that *McFarland, Coburn,* and *Webb* support the admission of the evidence. In *Healey*, the defendant was charged with having placed strychnine in food to be consumed by the prosecuting witness. The witness discovered the substance, put it in a bottle, and took it to a local banker to be sent away for analysis. Later, the witness retrieved the bottle from the banker and personally took it to a chemist for testing. In contrast, the record here shows that the evidence in question remained at all times in a sealed condition in the custody of public officials and employees, and was never placed in the hands of a non-official third person, like the banker in *Healey.*

*McFarland, Coburn,* and *Webb* involved blood samples drawn to determine alcoholic content in cases where the defendants were allegedly operating motor vehicles while under the influence of intoxicating beverages. In each case, the evidence in the record did not raise a suspicion of "tampering with" or "molesting" the samples. Absent such evidence, the court held the result of tests conducted on the samples to be admissible. We believe the same result is proper here.

Our conclusion is further supported by *United States v. Godoy*, 528 F.2d 281 (9th Cir. 1975). Godoy was arrested for selling amphetamines to an undercover officer. The amphetamines were sealed into a bag by the officer and mailed to the forensic laboratory for analysis. The bag was received at the laboratory and placed in a vault. Three months later, when a chemist removed the bag from the vault for testing, the seal was unbroken. The chemist opened the bag, tested the contents, replaced the amphetamines, and resealed the bag. On appeal from his conviction, Godoy raised the question whether it was error to admit the pills in evidence because of an insufficient showing of a chain of custody. He contended that because a number of government employees had access to the vault in which the amphetamines were stored, the government must make a showing that these employees did not meddle with the contents of the vault. The Ninth Circuit Court of Appeals disagreed with his contention. It said, "In ruling on admissibility, however, the [trial] court may assume, absent evidence to the contrary, that public officials have properly executed their duties and no additional showing to this effect is required." 528 F.2d at 284.

Likewise, in *United States v. Santiago*, 534 F.2d 768 (7th Cir. 1976), the court noted that "[b]ecause the defendant could elicit no testimony that any of the seals was disturbed apart from the ordinary course of examining the evidence or that the . . . labels had been altered, his claim is insufficient to rebut the Government's showing." 534 F.2d at 770.

The rule of placing the burden on the defendant to make some showing the evidence was tampered or meddled with, to overcome the presumption that the integrity of evidence routinely handled by government officials was suitably preserved, has been followed by several other courts. *See United States v. Lane*, 591 F.2d 961 (U.S. App.D.C.1979); *United States v. Daughtry*, 502 F.2d 1019 (5th Cir. 1974); *United States v. Brown*, 482 F.2d 1226 (8th Cir. 1973); *West v. United States*, 359 F.2d 50 (8th Cir. 1966) *cert. den.*, 385 U.S. 867, 87 S.Ct. 131,

**890**

17 L.Ed.2d 94 (1966); *Brewer v. United States*, 353 F.2d 260 (8th Cir. 1965); *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960).

■ Here, the established routine procedure of the laboratory in receiving, handling and securing the integrity of the evidence supports a presumption of regularity in this case. The testimony offered by the State showed that seals placed on the evidence were never broken except during the testing process and when the evidence was revealed in court. There was no showing by Ruybal of any alteration, tampering or adulteration of the evidence. It was not error for the trial court to admit the evidence.

The judgment of conviction is affirmed.

BURNETT and SWANSTROM, JJ., concur.